IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DARLENE AFRICA,                    )
              Plaintiff            )
                                   )
      vs.                          ) Civil Action No. 05-960
                                   ) Judge Terrence F. McVerry/
JO ANNE BARNHART,                  ) Magistrate Judge Amy Reynolds Hay
Commissioner of Social             )
Security,                          )
              Defendant.           )

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

        It is respectfully submitted that the Motion for

Summary Judgment filed by Plaintiff [Dkt. No. 6] be denied.  It

is further recommended that the Motion for Summary Judgment filed

by Defendant [Dkt. No. 8] be granted and that the decision of the

Commissioner denying Plaintiff's application for supplemental

security income be affirmed.

II.  REPORT

      A.   **Procedural History**

        Plaintiff, Darlene Africa, brought this action under 42

U.S.C. §§ 1383(c)(3) and 405(g), seeking judicial review of the

final decision of the Commissioner of Social Security

("Commissioner") denying her claim for supplemental security

income ("SSI") under Title XVI of the Social Security Act (the

"Act").

        Plaintiff filed an application for SSI on March 18,

2003, claiming disability since 1996 (Tr. 93).  The Commissioner denied her claim and on December 11, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 83-86).

A hearing was held on July 15, 2004, at which time Plaintiff, who was represented by counsel, and a vocational expert ("VE") were called to testify (Tr. 35-67).  The ALJ issued a decision on January 7, 2005, finding that Plaintiff had the residual function capacity to perform a significant range of light work (Tr. 27, Finding No. 9) and, therefore, was not disabled under the Act (Tr. 27, Finding No. 11).  The Appeals Council denied Plaintiff's request for review on May 21, 2005, making the ALJ's decision the final decision of the Commissioner (Tr. 6-8).

### B.   Factual Background

Plaintiff was born on February 3, 1958, and, thus, was 46 years old at the time of the hearing (Tr. 17, 39).  Plaintiff dropped out of high school after ninth grade and, other than working at McDonalds for several months in 1996, has no past work experience (Tr. 39, 40, 97-98, 115).  Plaintiff testified  that she never worked because she takes care of her daughter who is blind, partially deaf and developmentally delayed (Tr. 40, 50).  In addition to her daughter, Plaintiff lives with her husband and her nephew of whom she has custody (Tr. 39-40).  It also appears that Plaintiff and her nephew receive state welfare benefits and

2

that her husband and daughter receive social security disability benefits (Tr. 40, 94).  As well, Plaintiff has applied for and been denied disability benefits on three prior occasions the last of which was on August 12, 2002 (Tr. 16, 37-38).[1]  The Appeals Council denied Plaintiff's request for review of that decision on December 3, 2002, less than four months before she filed the current claim (Tr. 16).

C.   **Medical History**

1.   **Physical Evidence**

Plaintiff was examined by Melvin Alberts, M.D, on February 5, 2002, for constant low back pain and bilateral leg pain (Tr. 218-19).  Dr. Alberts reported some "give way" weakness in both lower extremities but noted that it did not appear to be of significance (Tr. 219).  It was also noted that plaintiff had some tenderness in her back and limitation in forward and side bending (Tr. 219).  Dr. Alberts diagnosed musculoskeletal back pain and recommended a regular weight loss and exercise program and ordered an MRI to rule out spinal stenosis (Tr. 219).

An MRI conducted on February 7, 2002, revealed moderate disc herniation and mild left foraminal stenosis at L4-L5 as well as mild facet arthritis at L3-L4 and L4-L5.  Plaintiff was

---

[1]   Accordingly, as found by the ALJ, the relevant period at issue in this case is from August 13, 2002 through the date of his decision (Tr. 16-17).  Indeed, at the hearing counsel for Plaintiff agreed that there were no grounds to reopen the prior final decision (Tr. 39). See 20 C.F.R. § 416.1457(c)(1)(2004).

subsequently evaluated in July of 2002 by a neurosurgeon, D. Kyle Kim, M.D., who reported that Plaintiff did not appear to be in distress, manifested no straight leg sign and no motor deficits (Tr. 221). Dr. Kim ordered another MRI which showed degenerative disc disease at the L4-5 level with a small protrusion centrally, which Dr. Kim did not believe was significant in nature requiring surgery (Tr. 220).

On September 16, 2002, Plaintiff presented at the Washington Hospital Emergency Room with pain in the right side of her head (Tr. 163-64). She was diagnosed with acute sinusitis and given prescriptions for Levaquin and Vicodin and told to followup with her primary care physician (Tr. 164, 166, 168, 169). A CT scan of her brain was normal (Tr. 170).

On October 17, 2002, Plaintiff was first seen by Ashith Mally, M.D., complaining of gastritis and pain in her leg, shoulders, low back, feet and ankles (Tr. 183). Dr. Mally reported a negative straight leg raise test and normal range of motion in her hip and knee and noted that she was able to get on and off the examining table and ambulate without much difficulty (Tr. 183). Dr. Mally continued to treat Plaintiff for gastritis, hyperthyroidism, and acute sinustis through April of 2004 (Tr. 181-83, 242). Dr. Mally also treated Plaintiff for depression prescribing a minimal dosage of Remeron which, in November of 2002, Plaintiff reported made her feel "considerably better" and

"in a manageable state" indicating that she did not want the dosage increased (Tr. 182).

Leslie Tar, M.D., a rheumatologist, diagnosed Plaintiff with fibromyalgia in October of 2002, reporting that Plaintiff had some trigger point tenderness but the objective examination was otherwise normal (Tr. 311). Dr. Tar prescribed Soma and in December of 2002, noted that Plaintiff was doing well from her perspective (Tr. 304). In January of 2003, Dr. Tar injected Plaintiff's left sacroiliac joint with steroids and stated in April of 2003 that Plaintiff has "been successfully treated" (Tr. 298). Plaintiff subsequently received two steroid injections in the right sacroiliac joint on July 23, 2003, and October 29, 2003, and one in the right trochanteric bursae on September 10, 2003 (Tr. 287, 291, 294). In October of 2003, Plaintiff reported that the pain she had been experiencing in her right ankle had improved by wearing high-top shoes and using Epson soaks (Tr. 286). Although Plaintiff reported left ankle pain in September of 2003, no abnormalities were found and in November of 2003, Plaintiff reported that she had no further complaints (Tr. 284, 290, 291). Plaintiff also indicated that, other than being a little sore after she fell on the steps and landed on her backside, she had been feeling fine (Tr. 284). Indeed, Dr. Tar's reports show consistent improvement throughout and examinations through September of 2004 were otherwise normal (Tr. 270, 272,

5

275, 278, 283, 287, 291, 293-95, 298, 301, 304, 308).

Plaintiff saw Dr. Tar again in February of 2004 complaining of headaches, wheezing and coughing, indicating that these symptoms worsened when she dusted the house, cut the grass or was exposed to damp environments (Tr. 279).  Dr. Tar tested Plaintiff for allergies and diagnosed Plaintiff with perennial allergic rhinitis for which he prescribed Singulair, Clariten and a Ventolin Inhaler (Tr. 280-81).  A pulmonary function test performed in August of 2004, was remarkable for bronchodilator response and Plaintiff was given another inhaler (Tr. 270).

Plaintiff also consulted neurologist G.S. Kathpal, M.D. who reported in November of 2003 that Plaintiff was "doing better as far as the headaches are concerned" and that medication and heat treatments seemed to be helping (Tr. 263).  Dr. Kathpal also noted that, despite complaints of pain in her neck, low back, leg, arm, and face, she was in no acute distress and had full muscle strength in her arms and legs (Tr. 263).  As well, Plaintiff's deep tendon reflexes were normal and no sensory or cerebral abnormalities were found (Tr. 263).

In January of 2004, Dr. Kathpal again reported that Plaintiff was doing better with her headaches noting that while she used to get them almost everyday she only gets them several times a month, they are less severe and usually not accompanied with nausea, vomiting, photophobia or phonophobia (Tr. 244, 260).

Although Plaintiff again reported pain in multiple sites and Dr. Kathpal noted that movement in her cervical and lumbar spines was limited and painful, he also noted that Plaintiff was in no acute distress and that her muscle strength, deep tendon reflexes and sensory examinations remained normal (Tr. 244, 260). Plaintiff's straight leg raising was positive on the right side at 60 degrees and on the left at 70 degrees (Tr. 244, 260). Dr. Kathpal ordered an MRI of Plaintiff's neck and lumbrosacral area and an EMG and Nerve Conduction study of all four extremities (Tr. 244, 260).

The MRI of Plaintiff's neck showed a tiny central protrusion without neural foraminal narrowing at the C5-6 level and the MRI of Plaintiff's lumbar area showed mild degenerative disc disease at L4 on 5 with a bulge (Tr. 250, 251). Although there was no central canal narrowing and no neural impingement there was a mild right and mild to moderate left neural foraminal narrowing (Tr. 250).

On March 17, 2004, Dr. Kathpal indicated that Plaintiff had injections in her neck and epidural blocks which helped her "to a significant degree," and that she generally seems to be doing better than before (Tr. 257). He described Plaintiff as being in no acute distress and reported that she had normal strength in all four extremities, normal deep tendon reflexes and gait and no sensory deficits (Tr. 257). His findings following

7

examination on June 5, 2004, were unchanged.

### 2.    Psychological Evidence

As previously mentioned, Plaintiff apparently sought state welfare benefits and, at the request of the Pennsylvania Department of Welfare, neuropsychologist Dr. Ravi Kant, M.D., conducted a consultive examination in August of 2002 (Tr. 160-62, 253-55). On examination, Dr. Kant stated that Plaintiff was in significant distress because of pain, depression and anxiety, that her mood was depressed and anxious and her affect almost flat (Tr. 161, 254). He also noted that Plaintiff's speech was normal in rate rhythm and tone, that her eye contact was fair, that she had no suicidal or homicidal ideations, that her thought process was logical, sequential, free flowing and goal directed, that her concentration and attention span were fair and that she had fair insight and judgment (Tr. 161, 254). Dr. Kant diagnosed Plaintiff with major depressive disorder, recurrent-severe, anxiety disorder and a global assessment functioning ("GAF") of forty-five (Tr. 162, 254).[2] He recommended that Plaintiff increase the dosage of Paxil, which she had apparently been

---

[2]    The Commissioner has represented, and Plaintiff does not dispute, that the GAF scale ranges form zero to ninety and is an indicator of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association.  American Psychiatric Association, Diagnostic and Statistical Manual of mental Disorders - Fourth Edition, 32, 34 (4th ed. 2000).  A GAF between 41 and 50 indicates serious symptoms such as suicidal ideation and severe obsessional rituals, or any serious impairment in social, occupational or school functioning such as having no friends and being unable to keep a job.  Id. at 34.

receiving from her primary care physician, follow up with a
psychiatrist and get treatment for her symptoms of pain (Tr. 162,
254).

In September of 2002, Plaintiff was also referred by
the Department of Welfare to James D. Petrick, Ph.D., for a
consultive examination.  Based solely on his examination and
Plaintiff's history as recounted by her, and without the benefit
of any medical records, Dr. Petrick found that Plaintiff's
psychomotor processing speed (Digit Symbol) was moderately
impaired with psychomotor retardation and that verbal learning
through repetition was moderately to severely impaired (Tr. 173,
174).  As well, Dr. Petrick found that cognitive speed and
efficiency were severely impaired and assessment of affective
disturbance suggested marked severity (Tr. 175).  Plaintiff,
however, was able to follow both simple and complex commands and
her intellectual functioning was within the average range (Tr.
174).  Dr. Petrick also noted that Plaintiff had no problems with
attention, concentration or primary memory functions (Tr. 176).
Dr. Petrick concluded that Plaintiff had a learning disorder, not
otherwise specified, and dysthymic disorder which were
substantial (Tr. 176).  With respect to Plaintiff's vocational
issues, Dr. Petrick found that although she had fairly well
defined work values, Plaintiff had no vocational goal or path and
would need substantial vocational counseling (Tr. 176).

In a third consultive examination on February 14, 2003, to which Plaintiff was referred by the Social Security Office in connection with a prior application for SSI, Oscar Urrea, M.D., found on examination that there was a "mild degree of psychomotor retardation in the background," that Plaintiff's orientation was times three, that her memory was normal, insight adequate and judgment minimally impaired (Tr. 200). Dr. Urrea diagnosed Plaintiff with major depression, moderately severe, prescribed Effexor and indicated that Plaintiff was to see a counselor on a weekly basis until he saw her again in six weeks (Tr. 200). Plaintiff only attended one of the scheduled therapy sessions and did not see Dr. Urrea again until October 11, 2003 (Tr. 193-200).

On that date, Dr. Urrea found that Plaintiff had no psychomotor abnormalities, her speech content and social judgment was appropriate, her thought process was fluent with no evidence of abnormalities, her memory was normal and her orientation times 3 (Tr. 190-91). Dr. Urrea also noted that while Plaintiff appeared more anxious than depressed her mood was overall appropriate (Tr. 190). He also found that Plaintiff appeared to be of borderline intellect due largely to her level of education and that her test judgment, concentration, persistence and pace were impaired (Tr. 190-91). Dr. Urrea concluded that Plaintiff had dysthymia and a history of major depression and a GAF of fifty (Tr. 191).

A state agency psychologist, Edward Zuckerman, Ph.D., reviewed all of Plaintiff's mental health records as well and determined that Plaintiff's affective disorder did not meet the severity of a listed impairment (Tr. 205, 208, 215, 217).  As such, Dr. Zuckerman completed a residual functional capacity assessment[3] on November 7, 2003, and concluded that Plaintiff had moderate limitations in four of twenty mental work related categories: the ability to carry out detailed instructions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting (Tr. 202-03).  The doctor found Plaintiff not significantly limited in the remaining sixteen categories (Tr. 202-03).  In addition, Dr. Zuckerman opined that Plaintiff was capable of working within a work schedule at a consistent pace, was able to make simple decisions and carry out simple and short instructions (Tr. 204).  He also stated that Plaintiff could sustain a work routine without special supervision and can function in production oriented jobs requiring little independent decision making and

---

[3]    An individual's residual functional capacity is what she can do in a work setting despite her limitations.  20 C.F.R. § 416.945(a).  See Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).

perform repetitive work activities (Tr. 204).  Dr. Zuckerman found that Plaintiff's activities of daily living and social skills are functional and that she has no limitations in her understanding or memory (Tr. 204).  He concluded that Plaintiff is "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments" (Tr. 204).

Finally, the Court notes that the only actual treatment Plaintiff received for her mental disorders was prescriptions for antidepressants as prescribed by her primary care physicians.  As previously discussed, in addition to the Paxil that, in August of 2002 Dr. Kant noted she was receiving from her primary care physician, it appears that Dr. Mally prescribed a minimal dosage of Remeron in October of 2002, which Plaintiff reported one month later made her feel "considerably better" and "in a manageable state," indicating that she did not want the dosage increased (Tr. 182).

### D.    Hearing Testimony and ALJ Decision

At the administrative hearing, Plaintiff testified that she sees a rheumatologist, Dr. Tar, once a month for her environmental allergies and fibromyalgia and that she sometimes gives her injections in her back or hip and has prescribed Clariten, Singulair, Soma and an Albuterol inhaler (Tr. 41-42, 52).  Plaintiff also testified that she is being treated by a

neurologist, Dr. Kathpal, for her back, right leg and shoulder, that he recommended therapy for her leg, has prescribed Flendil, Nadolol, Fioricet and Vicodin, and that he is supposed to give her injections in her neck (Tr. 43, 45, 54-55).  As well, Dr. Kathpal referred Plaintiff to Dr. Simith who is treating her for carpal tunnel syndrome (Tr. 44).  Plaintiff's family doctor, Dr. Mally, also treats Plaintiff for depression and hypothyroidism which, according to Plaintiff, has made her gain weight (Tr. 45-46).  Plaintiff testified that her thyroid condition makes her tired but also allowed that the Soma makes her tired as well and she is not sure "which is which" (Tr. 46).  Plaintiff also indicated that she consulted a psychiatrist, Dr. Urea, a couple of times but stopped going because he and another counselor wanted Plaintiff to place her daughter in a group home to relieve Plaintiff of the stress of caring for her which Plaintiff will not do (Tr. 46).

Plaintiff allowed that she can only sit for about twenty minutes before her back gets very sore and stiff requiring her to move around, that she has a lot of pain from her hip down to her knee and that her right foot gets numb making it difficult to walk (Tr. 43-44).  Plaintiff testified that it is painful to climb stairs but that she nevertheless does so because her bedroom and bathroom are upstairs (Tr. 44, 49).

Plaintiff also testified that although she had a

13

driver's license twenty-six years earlier, she stopped driving after having an accident (Tr. 47-48). Plaintiff stated that she does not do laundry because the stairs to the basement are "too much" and the cement floor causes soreness her back and legs (Tr. 48). Plaintiff testified that she does some cooking but that she is unable to lift a skillet with food in it because her hands go numb and she drops it (Tr. 48). As well, although Plaintiff is able to go shopping she is unable to put items in the cart or remove them because her shoulder gets sore and her hand goes numb (Tr. 49). Plaintiff stated that she sleeps off and on during the night and is awakened by pain in her legs (Tr. 49).

Plaintiff indicated that she is tired all the time and is unable to use a broom or mop or run the sweeper but is able to do dishes and fold laundry (Tr. 51). Plaintiff also testified that she is able to walk about "two blocks and come back" and able to stand for about ten or fifteen minutes (Tr. 51-52). Plaintiff stated that she soaks in the tub to relieve her pain and lays down four or five times a day for fifteen minutes to an hour (Tr. 52-53).

According to Plaintiff, she attended physical therapy for almost two months for her back and leg but was told to stop when they discovered a cyst on her ovary, which Plaintiff had removed in May of 2004 (Tr. 53). Plaintiff claims that after her surgery she had to remain in bed for several weeks for her back

14

from "being on the table" and "being cold" (Tr. 53-54).

When asked why she felt she was unable to work, Plaintiff replied that she's not sure what days she'll feel like doing anything and that even when she does feel like doing something she's not sure when she may have to lay down or get in the tub or need a heating pad which she does a lot during the course of the day (Tr. 54). Plaintiff testified that the pain is with her constantly even when she's not doing anything (Tr. 54).

Plaintiff also stated that she has arthritis in her feet but is unable to take any medication because she's on two different stomach medications and it makes her sick (Tr. 55).

Noting that Plaintiff had no past work experience, the ALJ asked the VE to consider an individual of Plaintiff's age, education, and vocational background who was able to perform a range of light work requiring a sit/stand option, could perform postural movements occasionally but not climb ladders ropes or scaffolding, could not be exposed to extreme temperatures or environmental pollutants, needed to work in a low stress environment with no production line pace or independent decision making responsibilities, was limited to unskilled work involving routine and repetitive instructions and tasks and no reading, spelling or math and should have minimal interaction with others. Based upon this hypothetical question, the VE testified that such an individual could perform certain office helper jobs, bench

15

assembly jobs, and machine tender jobs all of which exists in significant numbers in the national and local economies (Tr. 57-58).  The VE also testified, however, that if the individual had to lay down a couple of times during the day other than during scheduled breaks or lunch, that would be incompatible with competitive work (Tr. 64).

Based on this evidence the ALJ found that Plaintiff had severe impairments but that they did not meet or equal the listed impairment Appendix 1, Subpart P, Regulation No. 4 (Tr. 26).  The ALJ also found that although Plaintiff's limitations did not allow her to perform a full range of light work she retained the residual functional capacity to perform a significant range of light work that existed in the national economy and, thus, was not disabled (Tr. 26-27).

E.    **Standard of Review**

Presently before the Court are the parties' cross-motions for summary judgment.  In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).

16

Substantial evidence is defined as less than a preponderance and more than a mere scintilla. Richardson v. Perales, 402 U.S. at 402. If supported by substantial evidence, the Commissioner's decision must be affirmed. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

A five-step process is used to determine disability eligibility. See 20 C.F.R. § 416.920(a)(4).[4] Here, the ALJ determined that Plaintiff was not disabled at the fifth step which requires the Commissioner to prove that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

**F.   Discussion**

Plaintiff initially argues that the ALJ erred by not giving Dr. Urrea's opinion more weight as a treating physician and that the ALJ's findings that Plaintiff's psychological and cognitive impairments are not disabling is not supported by

---

[4]   The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform any other work in the national economy. 20 C.F.R. §§ 416.920(a)(4).

substantial evidence.

It does not appear, however, that Dr. Urrea is properly categorized as a treating physician.  As noted by the ALJ, the record establishes that Plaintiff was referred to Dr. Urrea by the Social Security Administration for a consultive examination in February of 2003 and was only seen by him on one other occasion eight months later (Tr. 23, 189, 200).  Indeed, Plaintiff concedes in her brief that she "did not maintain treatment with him" after the initial visit.  See Plaintiff's Brief in Support of Motion for Summary Judgment, p. 12.  Although Dr. Urrea scheduled appointments for Plaintiff to meet with a therapist from his office in the interim, Plaintiff neglected to show up for five of the six visits (Tr. 193-99).  Under these circumstances, it does not appear that Dr. Urrea established a treatment relationship with Plaintiff or that his opinion is entitled to greater weight.  See 20 C.F.R. § 416.927(d)(2).

Plaintiff also argues that even if Dr. Urrea is not properly considered a treating physician the ALJ nevertheless erred by not giving sufficient weight to his opinion or that of the other two consultive examiners, choosing instead to give greater weight to the non-examining state agency psychologist's opinion whose assessment was unaccompanied by a thorough written report.

It appears undisputed that determining what weight to

give various medical and psychological opinions is a task reserved to the Commissioner.  20 C.F.R. § 416.927(d).  In making that determination the ALJ is to consider the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors.  See 20 C.F.R. § 416.927(d)(1)-(6).

Here, Plaintiff has not discussed any of the reports made by the consultive examiners or the ALJ's findings in this regard but has merely concluded that the consultive examiners' reports were "thorough" and that the ALJ erred in failing to consider them.  Review of the ALJ's decision, however, demonstrates that he did consider the various reports cited by Plaintiff, as well as the other evidence of record, but merely arrived at a different conclusion.

Indeed, the ALJ initially noted that the evaluations of Drs. Kant, Petrick and Urrea were not only consultive in nature but were based entirely on the Plaintiff's subjective statements without the benefit of any of her medical records (Tr. 22-23).  As well, the ALJ noted that, notwithstanding the consultive examiners' conclusions, Plaintiff has not sought nor received any specialized mental health treatment and has been well maintained on a minimum dose of Remeron as prescribed by her primary care physician (Tr. 22).

More specifically, the ALJ found that despite Dr.

19

Kant's relatively benign mental status evaluation, which included
a finding that Plaintiff had fair concentration and attention
span as well as the fact that she had fair insight and judgment
and her thought process was logical, sequential, free flowing and
goal directed, he diagnosed a major depressive disorder and
anxiety disorder (Tr. 23).  The ALJ thus found that Dr. Kant had
simply accepted wholesale Plaintiff's subjective reports of
extreme depressive symptoms, anxiety and cognitive deficits (Tr.
23).

As well, with respect to Dr. Petrick, the ALJ again
noted that he relied solely on Plaintiff's subjective complaints
and reviewed no medical records whereas the ALJ had the benefit
of the entire longitudinal file going back ten years (Tr. 23).
Moreover, the ALJ noted a discrepancy between Dr. Petrick's
report and that of Dr. Kant, dated only one month earlier, with
respect to Plaintiff's statements regarding the onset of her
migraines (Tr. 23).  The ALJ also found that it was not at all
clear on what basis Dr. Petrick found Plaintiff's cognitive speed
and efficiency were impaired as his conclusions were not in
accordance with the observations of any other evaluator, the
other psychological evidence or the fact that her IQ scores were
in the 90s.  Further, the ALJ acknowledged that although the
"Beck depression inventory" showed severe depression he also
noted that it is a completely self-reporting document wherein the

20

claimant can state anything he or she believes the evaluator would want to hear and the evaluator then renders a diagnosis accordingly (Tr. 23).

Finally, the ALJ also considered Dr. Urrea's evaluation from February 2003, in which he found significant inconsistencies in what Plaintiff reported to Drs. Kant and Petrick only a few months earlier.  As such, the ALJ found Plaintiff's credibility suspect which, in turn, detracted from the weight he gave their evaluations which relied on Plaintiff's subjective reports (Tr. 23).  In addition, the ALJ noted that although Plaintiff's mental status evaluation was essentially normal and that Plaintiff had reported depression only in the past few months with good results on Remeron, Dr. Urrea accepted all of Plaintiff's subjective complaints in diagnosing major depression, moderately severe, with a GAF of 50 (Tr. 23).

The ALJ similarly rejected Dr. Urrea's report from October of 2003, noting again that Dr. Urrea's mental status evaluation was essentially normal and the fact that Plaintiff could not do serial 7's, a factor upon which Dr. Urrea relied in finding Plaintiff's concentration impaired, was of little significance in determining whether Plaintiff could perform a job as a laundry folder or vehicle washer (Tr. 24).  As well, Dr. Urrea found that Plaintiff's memory was normal despite her numerous complaints to the contrary.  It therefore appeared that

Dr. Urrea's conclusions were based on Plaintiff's subjective complaints and, consequently, the ALJ gave them less weight (Tr. 24).  See Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988)(The Commissioner is not bound even by a treating physician's opinion and may reject it if there is a lack of clinical data supporting it or if there is contrary medical evidence.)[5]

Plaintiff also faults the ALJ for giving greater weight to the mental residual functional capacity assessment made by the state agency's reviewing psychologist which Plaintiff suggests was in error because it was a non-examining evaluation and was not accompanied by a thorough report.

It is undisputed, however, that while the state agency physicians are non-examining physicians, they "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. § 416.927(f). Moreover, it is well established that an ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record.  Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991); Gordon v. Schweiker, 725 F.2d 231, 235 (4th

---

[5]    Moreover, to the extent that Plaintiff faults the ALJ for not accepting the finding of disability by the Department of Public Welfare, that finding, according to Plaintiff, was based on the opinions of Drs. Kant and Petrick.  Because those opinions were properly rejected by the ALJ, any findings by another agency based on those opinions were properly rejected as well.

Cir. 1984).

In the instant case, the ALJ considered Dr. Zuckerman's assessment in conjunction with other evidence of record and found that, unlike the opinions of Drs. Kant, Petrick and Urrea, it was not based on Plaintiff's subjective reports but was well reasoned and consistent with the longitudinal objective medical evidence of record (Tr. 19).  Indeed, as noted by the ALJ, the longitudinal evidence established that Plaintiff had no specialized mental health treatment, that she told another medical source in June of 2003 that she didn't need a therapist's help, and that she failed to attend the therapy sessions scheduled by Dr. Urrea (Tr. 19, 22, 24, 193-200, 297).  Moreover, the longitudinal evidence shows that Plaintiff's psychological symptoms were well controlled with a minimal dose of Remeron as prescribed by her primary care physician and that she only attended mental health evaluations in connection with her efforts to secure welfare and social security benefits rather than for treatment (Tr. 19, 22, 24, 182).  Because Plaintiff has not contested any of these findings or pointed to any inconsistencies in the longitudinal record, it appears that the ALJ's decision to afford Dr. Zuckerman's assessment greater weight is supported by substantial evidence.

Moreover, as argued by the Commissioner, notwithstanding the above, the ALJ nevertheless accommodated

Plaintiff's mental limitations by limiting her to low stress work with no production line type pace or independent decision making responsibilities, unskilled work involving routine and repetitive instructions and tasks with no reading, spelling or math and minimal interaction with others (Tr. 24).  Under these circumstances, it appears that the ALJ's finding in this regard are supported by substantial evidence.

Plaintiff also argues that the ALJ erred by not crediting her testimony regarding her symptoms and restrictions in daily activities and her complaints of exertional and non-exertional pain.

In determining whether a claimant is disabled by pain or other symptoms the ALJ must first look to see if there are medical signs and laboratory findings which demonstrate that a claimant has a medical impairment which could reasonably be expected to produce pain or other symptoms alleged.  20 C.F.R. §§ 416.929(a), (b).  See Green v. Schweiker, 749 F.2d 1066, 1070-71 (3d Cir. 1984).  If such an impairment is established, the intensity and persistence of that pain is assessed to determine the extent to which it limits the claimant's capacity for work.  20 C.F.R. §§ 416.929(a), (c).  "This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

24

Further, although the ALJ is required to give great weight to the claimant's subjective complaints of pain, even those that are not supported by objective evidence, he has the right, sitting as the fact finder, to reject entirely or in part those complaints that are not fully credible. Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974). See Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir.1993). The ALJ, however, must provide specific reasons for his credibility determinations. Krizon v. Barnhart, 197 F. Supp. 2d 279, 289-90 (W.D. Pa. 2002), quoting Schwartz v. Halter, 134 F. Supp. 2d 640, 654 (E.D. Pa. 2001).

Here, although the ALJ acknowledged that plaintiff has medically determinable impairments that could reasonably be expected to cause some of plaintiff's symptoms and pain, he found that her subjective statements regarding their frequency and severity were not fully credible (Tr. 20). In so finding, the ALJ provided the following reasons for his determination: that while Plaintiff complained in October of 2002 of constant level nine out of 10 pain in multiple spots for two years, Dr. Mally's examination was essentially normal; on November 20, 2002, Dr. Mally reported that Plaintiff felt considerably better since taking Remeron for her depression and that she had no specific pain complaints; that Dr. Mally made no musculoskeletal diagnosis and his March 24, 2003, physical examination was essentially normal; that a CT scan of Plaintiff's brain taken in September of

25

2002 was essentially normal; that Dr. Tar's physical and
neurological examination on October 30, 2002, was essentially
normal; that, at that time, Dr. Tar reported that an examining
neurosurgeon, Dr. Prostko, had recently opined that Plaintiff's
mild disc herniations were not clinically relevant; that Dr.
Tar's diagnoses varied although she consistently reported
essentially normal neurological and musculoskeletal clinical
signs that had remained unchanged during the two year treatment
period; that on December 5, 2002, Dr. Tar reported that
Plaintiff's fibromyalgia was doing well from her perspective;
that in July of 2002, neurosurgeon Dr. Kim reported essentially
normal physical and neurological examination; that Dr. Kim
reported on September 16, 2002, that a lumbar MRI done the month
before showed degenerative disc disease at L4-5 with a small
protrusion which in his opinion was not of a significant nature;
that Dr. Kathpal reported in January of 2004 that Plaintiff
stated that her headaches were much less severe and much less
frequent and that, although Plaintiff had some pain and
tenderness with range of motion of the cervical and lumbar spine
with positive straight leg raises, she had normal sensation,
reflexes and strength in all extremities; that cervical and
lumbar MRIs done on February 7, 2004, showed only a tiny disc
protrusion at C5-6 and changes at L4-5, but no canal narrowing or

neural impingement;[6] that Dr. Kathpal's examination in March of 2004, showed that Plaintiff had normal strength in all extremities, no sensory deficits and a normal gait and that the injections Plaintiff received in her neck helped significantly; and in June of 2004, Dr. Kathpal reported that Plaintiff was in no acute distress with essentially normal clinical signs and, although diagnosed headaches, made no mention of migraines (Tr. 21-22).

As well, the ALJ stated that Plaintiff appeared to be exaggerating her symptoms for secondary gain noting that she had been trying to get disability for most of her adult life and had never worked one day other than for a brief period in 1996 at McDonalds where she reported earning $343.36 (Tr. 20).  The ALJ also noted that Plaintiff's representation that her husband helps her significantly with her household chores and activities is inconsistent with the fact that her husband receives SSI payments for severe back pain and with her representation to Dr. Tar in February of 2004, that she dusts the house and cuts the grass (Tr. 279).  Further, the ALJ noted that Plaintiff's ability to care for her disabled daughter, who also received SSI payments, was inconsistent with her claims of extreme pain and exertional and non-exertional limitations.  The ALJ also found that

---

[6]    The ALJ also noted that this would be consistent with the opinions of Drs. Kim and Protsko that Plaintiff's lumbar condition was not of great significance (Tr. 22).

Plaintiff's desire to stay home and care for her daughter and husband was additional motivation to exaggerate her symptoms for secondary gain.  Pointing out that every member of Plaintiff's household, which includes her husband, daughter and nephew, is receiving federal or state assistance payments, the ALJ opined that Plaintiff clearly wants to receive such benefits as well so that she doesn't have to work (Tr. 20).

Finally, the ALJ incorporated by reference his earlier decision in which he found that Plaintiff was highly motivated by considerations of secondary gain at that time as well, often presenting to her doctors with a variety of welfare and disability forms to fill out (Tr. 73).  The ALJ also noted therein that when Plaintiff and her husband were told by her family doctor that other medical sources had found her physical examination unremarkable and that she should be able to work, her husband became outraged and Plaintiff soon thereafter transferred to another family practice group (Tr. 74).

It therefore appears that the ALJ not only gave specific reasons for his conclusion regarding plaintiff's credibility but that his conclusions in this regard are supported by substantial evidence.

We also note that Plaintiff's complaint that the ALJ "failed to comment on the use of several prescribed medications" and disregarded pain in her shoulder appears to be without merit.

28

Not only has Plaintiff failed to identify what medications she is referring to but has failed to suggest what significance they have in relation to Plaintiff impairments or ability to perform a range of light work.  Moreover, to the extent that Plaintiff is suggesting that the medications themselves affect her ability to work, as the Commissioner has perceived her argument to be, Plaintiff has not pointed to any evidence of record which would support such a finding.  Indeed, the only seemingly relevant evidence is Dr. Tar's April 2003 notations in which she indicated that Plaintiff reported that after she took the two antidepressants prescribed by Dr. Urrea she slept for three days and had associated headaches and vomiting (Tr. 298).  Dr. Tar's notations also indicate, however, that Plaintiff thereafter discontinued that medication (Tr. 298).  As well, it appears that Plaintiff subsequently reported to Dr. Tar that she was doing well on the Remeron prescribed by Dr. Mally, whose records are devoid of any reports of ill side effects from medication (Tr. 181-83, 240-43, 293, 295).

Plaintiff has also made a passing reference to shoulder pain in the argument section of her brief which seemingly finds support in the fact section where she states that "[t]hroughout his course of treatment Dr. Tar found trigger point tenderness in the shoulders (R. 269-312)."  Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 4-5.  Review of Dr. Tar's

records regarding Plaintiff's shoulders, however, indicates, without exception, that "tenderness, crepitus and pain with movement were absent" (Tr. 270, 272, 275, 278, 283, 287, 291, 294, 296, 299, 303, 307, 311).  As such, Plaintiff's assertion that the ALJ erred by disregarding her shoulder pain has no support in the record and does not provide the basis for finding that the ALJ's determination that Plaintiff is capable of performing a range of light work is unsupported by substantial evidence.

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Edelman v. Commissioner of Social Sec., 83 F.3d 68, 70 (3d Cir. 1996).  In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is supported by substantial evidence.  For this reason, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of the

objections to respond thereto.  Failure to timely file objections
may constitute a waiver of any appellate rights.

                              Respectfully submitted,


                              /s/ Amy Reynolds Hay
                              AMY REYNOLDS HAY
                              United States Magistrate Judge

Dated:   23 March, 2006

cc:  Hon. Terrence F. McVerry
     United States District Judge

     Charles C. Bell, Esq.
     JOHN R. DEANGELIS & ASSOCIATES
     938 Penn Avenue
     7th Floor
     Pittsburgh, PA 15219

     Paul Kovac
     Assistant United States Attorney
     United States Attorney's Office
     700 Grant Street
     Suite 400
     Pittsburgh, PA 15219